Case is number 519-0037, Staples v. Schemonia. Counsel ready? You may proceed. Good morning, Your Honors. Counsel, may it please the Court, my name is Christine Hines, and I represent the plaintiff in this action, John Staples. My argument this morning is going to focus on three issues. First, the error of the trial court in denying Mr. Staples damages. Second, the error in denying him an injunction for the use of his permit easement. And third, the error in denying the motion to reopen the proofs. Judge Thurston correctly noted during the trial of this case that Union County has more water disputes than I have ever seen, and that's true. And why is that? I think it's because water is so important to us, to our life. We need it for our lives and living our daily activities. In our particular case, the plaintiff was given a specific right to use of water through an easement that was recorded back in 1974. And in the years that followed, the right to that water was taken away from him in approximately 2017 when the defendant, on a whim, turned off the water supply. As a result, Mr. Staples had to incur monetary damages to put a new cistern in, excavation, other labor costs. And as in the case that we cited, the Metro Water Reclamation case, under my law, if you interfere with someone's rights to their water, then you can be liable for damages. And we ask that the plaintiff be awarded the damages he proved in court. The denial for injunctive relief we feel is wrong. The plaintiff definitely proved his rights to the use of water under the easement that was placed into evidence. What's interesting about this particular type of easement in that if you look at it, it describes a broad, general description. It doesn't really focus on any particular spot on the face of the earth where the easement is located. Both the experts of the plaintiff and the defendant said, you know what, that's really not that uncommon. That's called a floating or blanket easement. That is not actually the location which is not decided upon. The parameters are not put in place until the parties themselves determine by their use, by their agreements, where the easement should take place, where it should occur. And that's what happened here. What was the date of the written easement? That easement was in 1974. It was recorded in 1974. And when was the first activity, physical activity of actually doing anything about putting in any structure there at the spring? There was a structure there at the spring prior to 1974. There was a water well at the spring as described in the easement. I recall in reading the briefs that there was some dispute about there being a water well at another location, that the appellee has indicated that that's what the well referred to and that he had filled that in at some point. And that his surveyor, I believe, testified about that. Is that correct? That's somewhat correct, Your Honor. That is his position, that there was an old, caved-in well off-site, never referred to in any of the surveys that were placed into evidence. All right? It was an old, caved-in off-site that had allegedly been used by the original processor of interest to the defendant. The record actually shows that the defendant's expert admitted he never saw any indication of this well, and basically said if this well existed, then maybe it could have been the well it referred to. He never came out and said that this, we believe, canard ever existed. Interestingly, if his expert believed that there was a well located off-site, as the defendant suggests, then under the requirements for surveying in Illinois, he should have made a reference to that old, alleged well. He never did. The only well that has ever been referred to in any of the surveys that were performed and submitted during this case is the water well located within the easement. And frankly, until I became involved in this case, I never heard of a water well. I had no idea what it was. I thought they were referring to a deep well. Oh, no. Under Illinois law, as we cited in our brief, a water well means any excavation. It can be a hole in the ground that is used for the acquisition of water. It's a statutory definition. So in this case here, the water well that everybody talks about isn't a deep well that's standing above the ground. There is a ceramic tile in the ground. You put it in the ground, and the water bubbles up. The plaintiff testified that prior to 1974, because his stepfather was the brother of the original owner, so they all have ties here, his family would go down to the water well, dip out water, and carry it to the house. So it was in use long before the defendant had the property, long before the plaintiff had his property. It was on there prior to 1974. And Illinois law has also supported the plaintiff's position regarding this unusual type of floating or blanket easement in the Purdick's case. What part of Union County is this located in? Jonesboro. They both live in Jonesboro? I assume it's rural Jonesboro. Yes, very rural Jonesboro. Which way out of town would it be? Just curious. South, I believe, of Jonesboro. I've never been there, to tell you the truth, so I don't know. I get lost very easily, so I don't go out in the country very much. Thank you. But, so, oh, it's interesting, too. The plaintiff's expert met with the defendant on the defendant's property back in December of 2017, in order to prepare the survey to be used for this case. He specifically asked him, hey, is there any other water source I need to be made aware of here? He didn't tell him anything. The only water source referred to was the water source in the easement, the water well. So if the defendant at that time had been focusing on, hmm, you know, there's really an old water source here, he should have told the surveyor about that. Never been mentioned, never shown in any other survey, because no one ever used it. They've only used the water well in the current easement. The court, in making its ruling, believed that Mr. Staples, the plaintiff, was truthful in his testimony about his memory and recollection of prior to 1974. His concern was that, you know, sometimes memories fade as we get older. But there was no evidence to prove that Mr. Staples' memory in any way was deficient in growing up on the property and remembering that there was a water well there. The third issue, in terms of reversing the Trotter's decision, the plaintiff should have been allowed to reopen the proofs of the evidence. And here's why. During the trial, the case, the opposing counsel asked... That's an abuse of discretion standard, correct? No. I don't believe it is. Why is that not abuse of discretion standard? And, Your Honor, if I can go back and get my brief, I can tell you specifically if it's abuse of discretion standard. I don't require opinions. You may. And while you're looking for that, I believe that the other issues in this case are also the most deferential. That would be a manifest weight on the other issues. And... Would you agree with that? It's manifest weight of the evidence is the standard for the complaint for damages, and it was abuse of discretion in terms of reopening the proofs. That was the standard of review. Okay. So that's what I said. You're correct. You're correct. Okay. Thank you. So the standard for determining whether proofs can be reopened is threefold. You look at whether there was any type of intention or inadvertence or calculated risk involved in not producing the evidence. You look at whether the opposing party would be prejudiced if the evidence was reopened. And you look at whether the evidence is of the utmost importance to remove this case. And finally, if there were any cogent reasons to deny. During the trial, Mr. Stables was asked by opposing counsel, is there anyone else who may have information about this water well? And he told them, yes, Mr. Hitham has lived on the property a long time. We didn't call Mr. Hitham to justify, but here's why. Mr. Hitham is not well. He has a very severe heart condition. And he did not want to come to testify out of fear of repercussions of what could have happened. We know from the facts that when the defendant became angry at Mr. Stables, well, he was away at work, as Mr. Stables works, 30 days a month, that he's on the river. Well, he was gone, and Mr. Stables' family was there, along with two women. The water was turned off. They had no water to use. So Mr. Stables came back and began this activity. So Mr. Hitham was afraid. He did not want to get involved, as many times people do. So out of deference to him and concern for himself, Mr. Stables didn't call him. That's why we asked, within the time frame allowed, to allow the proceeding to be reopened so he could come and testify as to his knowledge of the water well infrastructure being there prior to 1974. Because as the affidavit showed, he had lived there prior to that time. The trial court erred in denying the request of Mr. Stables, and we ask that this Court rectify that. Thank you, Counsel. Good morning. Good morning. May it please the Court, my name is Sean Croman. I'm here representing the defendant, Larry Shimoni. And, of course, I am here to ask you to uphold the reason and thorough judgment of the trial court. I know this is a matter that's been well-breathed, but I'm going to skit over some of the history of it for you  and give you a recitation of what happened. As you may have noticed, it's a small claims trial. It's unusual in that it was a small claims case. They chose to file it that way, though it's asking for a permanent injunction and then damages. They could have filed it in MR, or they could have filed it in Chancery, which would be kind of more appropriate. Because of the small claims, there was no discovery conducted. We had two experts, and we had a two-day trial on these issues, and, oddly, there was no discovery. We talk about witnesses that weren't there. They have a substantial burden of proof, and no pretrial discovery was conducted. So everything that we know about this unfolded at the trial, which was kind of odd in that sense. And that choice was made by plaintiffs when they chose to file it as small claims. What they were seeking here is an extreme remedy. They're asking for a permanent right to source water from my client's property, from a spring that percolates on his property. This is not an open stream. This is not riparian rights. This is underwater rights. And the Illinois Supreme Court has long held that, you know, we honor the English rule that water that percolates up through the soil of someone's property is absolutely the property of the person that owns it. It's like a tree on your property. And so there's a huge burden for someone else to prove that they have a right to come in and access that water in perpetuity, in an unlimited respect. And so when they're asking for a permanent easement, that's an extreme remedy. And so accordingly, Illinois courts have long held that they have a heightened burden, as Justice mentioned. It's clear and convincing evidence to establish a right to a permanent easement and express permanent easement. That's a very high burden, as it should be. Counsel talked about the evidence that was submitted to the court. Well, of course, all the evidence that was submitted by the plaintiff about whether there was a well at the location of this spring, whether there was another well, that was disputed, of course, by my client. And it was also disputed by my client's expert. There was evidence that went one way and went the other way. But it's not my burden to disprove their right to a permanent easement to access my client's groundwater. It's their burden to prove it. And so we don't dispute that the parties disagreed. But we think that the court absolutely weighed that evidence thoroughly and correctly and established that they didn't meet their burden to prove by clear and substantial evidence that they're entitled to this. Counsel, what about this argument that, well, this other water well wasn't even on the survey of your expert? Did I understand that correctly where this supposed other water well that could have been was not shown on any other survey? I think that's correct, Judge. And a little kind of description of the property is important. So back in 1974, when this document was recorded, all the property was owned by someone named Waltzell. It was his homestead. And if you think of the shape of the property like a bottle, his actual homestead, his house, his barn, and the well were kind of at the neck of the bottle. And that's where the road came in from, the county road. And the rest of the bottle was undeveloped. So in 1974, he deeded a small parcel of that undeveloped bottom of the bottle, we'll say, to plaintiff's parents. And at that time, that's when the easement was granted. It simply said, you have a 12-foot wide easement to put in a water line to a water well. Uncoincidentally, and this was important to the trial court, at the exact same time, there was also an identical easement recorded that gave a 12-foot wide easement to establish a road. Because there was no road from the neck of the bottle, so to speak, down to the bottom. The water line was never put in. But the road was. And that's significant. Because the language of the easement is tracked exactly. And the road goes from plaintiff's property up to the bottleneck right next to Carlebelt Sells' old homestead where the well was and his house and his barn. And so it stands to reason, as our experts say, that since the easements were identical and the road was built and the water line wasn't, we can assume that the water line easement was intended to go to the exact same place, which is where that old well was. So even though that well wasn't on any survey, there's no reason that it should have been. When that 1974 easement was recorded, no survey was conducted at all by anybody. It's the court's job to determine the intent with regard to an express easement. And the first thing to do when you're trying to do that is look at the four corners of the easement. Here, there's no dispute by any parties or any experts that when looking at the four corners of it, no one can determine where it is. There's not a map. It doesn't sufficiently describe it. It just says a 12-inch easement across this giant parcel of property at the bottom. Then you draw up other ones. I'm sorry. He said 12-inch. 12-foot. I'm sorry. Which is uncoincidentally, again, the width of the road that was ultimately built. Next, the court is supposed to determine the intent of the parties to the easement. Here, unfortunately, all the parties to the easement are deceased. There was no evidence submitted to the trial court about the original party's intent. That's not my client's burden to do so. The plaintiffs introduced nothing about the original party's intent. No documents. No other testimony. They talked about a witness. They failed to call. But again, and I can address that later, but that's not my burden to do so. In 1985, Judge, and this gets to your survey question, in 1985, my client's expert, Mr. Garner, was hired to create different easements. Three years after the subject easement, my client bought a chunk of this property in the bottle in 1977. Now there's two subdivided pieces of the old ball cell. Now these are the guys that are fighting, obviously. They're right next to each other. In 1985, he hired Mr. Garner, a surveyor, to come in and create a completely separate easement that has nothing to do with this easement. He found out he had a spring on his property, which, by the way, at that time was a mud puddle. There was no infrastructure there whatsoever. The plaintiff disputes that. But my client, who lived on it, said there was nothing there until I started putting infrastructure there in like 1988. And Mr. Garner, the surveyor that was there in 1985, corroborated that testimony. He said, I was there in 1985. I drew a survey in 1985. There was nothing at that spring but a mud puddle. Nothing to capture water and pump water and transport it someplace else. Nothing to even use the water. It just bubbled up out of the ground and went into the lake there. So in 1985, my client hired him to create easements to other parcels from that spring. It had nothing to do with the 1974 easement. He didn't memorialize the 1974 easement. He didn't even address it. And the reason his survey doesn't include the place where the old well was is because that wasn't within the scope of what he was supposed to do. There just isn't a survey that exists that we're aware of, or at least that was submitted to the trial court, where that original well was, according to my client's testimony. Incidentally, the plaintiff's expert, who did not know Mr. Garner, who had created the 1985 survey, based part of his testimony on that survey. And he said, well, Mr. Garner, in 1985, created the survey. And he identified this spring, the muddy puddle. And that, I've deduced, is the well that was referenced in the 1974 easement. And I can say that because that's what he meant. Well, he didn't know when he said that, that my client was going to hire Mr. Garner again, and he was going to be another expert witness. And so Mr. Garner called me and said, that is not what I meant. I did not intend to memorialize a water well that was referenced in the 1974 easement. I meant to identify the location of a spring and create new easements. I didn't mean that at all. And Mr. Garrett, notably, when he was called as a rebuttal witness, refused to defer to Mr. Garner, who created the 1985 survey, with regard to his own intent. So he still stood by and said, no, I'm relying on that survey to support my position that it memorializes the well from the 1974 easement, even though the guy that made it said, that's not what I meant at all. And that wasn't my intention. And that's very telling. With regard to the burden, you're correct, Judge, that it is manifest weight of the evidence here too. That's also substantial burden. You have a double substantial increased burden for the plaintiff to be entitled to reversal of the trier of fact. I'll tell you, Judge Thurston was incredibly patient for a small claims case. We had two full days of testimony. We had five witnesses, only four of which you've heard about. The other one wasn't really relevant. He let everything in. As I imagine he should in a bench trial. There's no allegations that he kept any evidence out, except for the motion to reopen proofs. There's no allegations of prejudice. There's no allegation, if you know it, that he misapplied the law in any way. The only allegation or basis for their appeal is, we think he weighed all the evidence incorrectly. So much so that it's against the manifest weight of the evidence, even in light of the fact that our burden is highly elevated, clear and convincing, to prove our right to an injunction. Counsel started with the damages issue. They divided it into damages, the injunctive relief, and the motion to reopen proofs. The damages issue flows from the injunctive relief, obviously. If there is no injunctive relief because there's no easement, there can possibly be no damages. So I think that's moot, if you rule on that first. But I'll address it briefly. The damages claimed are that after the party's kind of oral agreement to let him access the spring fell apart, because they stopped being good neighbors and being good friends, and that's what happened. He went out and put a cistern in his own property. A very large big cistern, dug a hole, put it in the ground. That constitutes a permanent improvement to his land. That's not damages. If somebody takes away my pool pass, I can't just put in a pool at my house and say, well, you've got to pay for my pool. Losing access to water and then putting in a permanent improvement that improves the value of the land is not damages related to being deprived of your easement. But again, they have not proved the easement. He continues to have that cistern, and he hauled water to it today to use for his house. That's the point of it, and it benefits him. Moving on to the motion to reopen proofs. Again, I have to note that this was small claims, and the rules of civil procedure in Illinois dictate that post-trial motions are not allowed except for with leave. And so it wasn't a motion to reopen proofs, and this might be a small issue, but it was actually a motion for leave to file a motion to reopen proofs. Plaintiff never said that for hearing. So we had an October judgment. They filed a motion for leave to file a motion, which means the motion was never technically filed. Two months later, Judge Thurston, without having ever anyone try to set it for hearing, he denied that motion. And so technically, no post-trial motion was ever filed in this case. It was filed after the judgment. It was filed after the judgment, but even that motion, Your Honor, was just a motion for leave to file it. And then the judge denied the motion for leave to file it, which means I think technically it was never filed. But regardless, the argument there is we want to reopen proofs after there's been a judgment, a two-day trial. The judges spent substantial time weighing the evidence and drafting a very thorough six-page order that I hope you have an opportunity to read, because I think he got it very right. I don't think any reasonable person could have came to the opposite conclusion, in fact. But after the fact, they said, well, now there's this witness we knew about all along, and we really wish we would have called him, because we really think it would have cooperated with the plaintiff's testimony. And we want you to reopen this whole trial, interrupt the whole workings of the court, to let us put on a whole new witness and start this process all over again. And their only basis for that is we lost him. We really wish we would have called him. She talks about the elements of reopening the proofs. The first one is hidden burdens. Was it hidden burdens? Yeah, they knew who the guy was. They said they decided. They thought about it. And they decided not to call him. Now, she said it's because he's sick. But I imagine if he's an old man, he's still sick. I don't think that that has changed. They did not subpoena him. They did not subpoena any witnesses to trial. They chose not to do that, and now they want you to remedy their mistake. And it was a discretionary choice that they made. The second is prejudice in the defendant. My client would be highly prejudiced. This is a small claims case. It has cost lots of money. Here I am before you. And this started years ago in 2017. These are not wealthy people. It's very rural. They live in cabins around this lake. He's already been substantially prejudiced. And reopening this trial after he's had to pay counsel to attend a two-day small claims trial, call expert witnesses, hire an expert, would substantially prejudice him. And I think that's clear. The third one is was it important? The witness that they chose not to call. Well, it's just a corroborating witness. That's it. It's not some new evidence nobody knew about. It's just someone that's going to say the same thing somebody else already said. And so I don't think it's important. And Your Honor, you're right. It's abuse of discretion standard like any evidentiary ruling. And I think the judge clearly did not abuse his discretion by not choosing to reopen a trial that had been done, where all the evidence came in and everybody had an opportunity to submit anything they wanted because somebody forgot to call a witness. There was some talk about the handshake agreement between the guys. So from 1974 to 2000, nobody ran a water line. I mean, this easement sat dormant for 45 years. There's no dispute about that. Nothing happened. Nobody did anything at all. Forty-five years after it was recorded, my guy and the plaintiff had a handshake deal. He said, hey, look, I finally installed some infrastructure around my spring, that muddy mud puddle. I put in some tiles. I put in a capture basin, and I built a well house, and I brought power to it. For the first time, 45 years later, this spring can actually be infrastructure to capture water and pump it to people's houses. And the parties had a handshake deal, and they said, hey, look, as long as we get along, you can pump water from my house. And then they did that for 17 years. And then my guy, who owns the spring, they started to not get along. Somebody's dog killed somebody else's dog. That's not really important, but that's, you know, they stopped being friends. And he said, I don't want to grant you this license anymore. And that's exactly what it is. It's a license. An oral agreement to give somebody access to your property to use it under the statute of frauds is just a license. It wasn't in writing. If you let somebody stay at your house for 17 years, they don't somehow gain a right to perpetuity to live on your property. Similarly, nobody, because you let them access a spring on your property and the infrastructure you've built to capture water from it, somehow gains some right. And they didn't plead that in the trial, but they kind of argued it like it was an implied easement, so I feel important to bring it up. And the argument seems to be that, well, in conjunction with the original written easement, those two things together memorialize the written easement. And that's just not how it works. You can't do that 45 years later by kindly giving somebody access to your property. It doesn't retroactively turn the 45-year-old easement into this easement. And just so it's clear, the well at the neck of the bottle is far, far away, a completely different direction from the spring on my client's property. If the road and the original waterline easement were intended to be in the same place, as evidenced by where the road was actually built, nobody could reasonably say, well, I think that this one was meant to go to the spring that's in an entirely different place on the property, that at the time could not produce water, and put it this way. Had my client not bought that part of the property where the muddy mud puddle was and put in this infrastructure, no one could possibly come in 45 years later and say, I have a permanent easement to that muddy puddle, and I think it is the well that was referenced in this 45-year-old document to give me access to water. Because you couldn't even access water there. There'd be no way to do it. And so, Judge, it mostly just doesn't make sense. And I think that the court should defer to the trial judge. He heard the testimony. He heard the witnesses. He did an excellent job. He was very patient. I asked to keep some evidence out, and to his credit, he let everything in. He heard it all. And if you're going to overturn this, we have to overturn everything, because there's always going to be conflicting evidence. You know what? A tie does not go to the norm, especially in this case, when you consider that their burden is clear and convincing, and that the burden here is that the judge's judgment was against the manifest weight of the evidence. You can look at the evidence. There are disagreements. But it's at least a tie. And I think we established strongly that this easement doesn't mean what they say it means. And they certainly did not meet their burden to establish a permanent right to access water from my client's property in perpetuity. And so we'd ask that you uphold the judgment of the court, not reopen proofs, and let this be over. Thank you, counsel. Thank you. Thank you. This activity between the parties in 2000, whenever the plaintiff put in a pump and water lines and the defendant put in a cistern at the location of where the easement is now, has nothing to do with an agreement between two buddies to use water. At that point, the 1974 floating or blanket easement was defined by the two people who were in control of it. That's what happened then. That's when the easement came to its fruition in terms of where it was supposed to be. Because before that time, there was no need for anyone to have access to water in this way. And as the Perpix and Verizon case delineated, whenever you have a floating broad easement, it doesn't really become effectuated until the parties themselves define the parameters and location on the face of the earth. And that is what they did. I also want to point out on the record, page 210 to 211, the defendant admitted that in 1977, when he purchased the property, he was aware of the water tile that was already there within the easement. He also testified that he, in 1988, put a separate water tile in for his own use. But the water tile, the water well, excuse me, that's being used now, which is a water, a water tile on the ground being used by the parties, has always been used by the parties, that's the one that was there prior to 1977 when the defendant bought the property. It was there prior to 74 when the easement was first created between the two Watts Hill brothers. Now, it's interesting with the testimony of the defendant's expert, Mr. Garner. He filed a document, 85 under oath, that he prepared a survey at the request of Larry Shimonia. Now, we fast forward to 2018, and he testifies in court that that same 85 testimony, that 85 survey was prepared at the request of Larry Shimonia and Mr. Watts Hill. When I questioned him on cross-examination, I said, now wait a minute. Your document here under oath says that you prepared this survey only at the request of Larry Shimonia. Now you're saying under oath you prepared it at the request of two people? He quickly recanted and admitted that he only prepared it at the request of Larry Shimonia, that both cells had nothing to do with the preparation of the survey. But it wasn't until I confronted him that he admitted he had basically lied under oath. So I really believe his testimony, for anything to do here, can really not be accepted by this court because it's somewhat compromised because of what he said under oath and what he filed under oath with the survey. With these reasons and reasons asserted in our briefs, we ask that the court reverse the trial court. Thank you. Thank you, counsel, for your arguments. The court will take this matter under advisement.